The first case set for argument this morning is number 20 1666. I believe that's correct. Yes, farhan versus United States. Mr. Kasim. Morning. Good morning, please the court had been a lawful permanent resident, instead of a naturalized US citizen. At the time he pled guilty in 2006, there would be no dispute that his defense lawyers failure to advise him of the risk of severe immigration consequences would have constituted an effective assistance of counsel. This feature is among the absurd implications of the district courts ruling below. That's the government's position. That's because the money laundering is an aggravated felony. And that is correct, Your Honor. That's absolutely correct. And under that view. So there, he could, if he were, if you were not a citizen, not a naturalized citizen is deportation would be virtually automatic. Under those circumstances, exactly, as was, as was spelled out in PDFs. Is that your point. Exactly. Judge Walker would be virtually indistinguishable from video because it's the exact same deportation statute that was an issue in video. Right, but here you have a situation where there's a, there's a two steps. In other words, you don't get to the deportation and get to you get to the the denaturalization. And here is seems to me you've got a different slightly different dynamic, because even if you were to take the admissions at the time of the plea he could still be denaturalized based on the underlying facts here of lying to the agents. Under the form 400 and the other form for something. At the time, by just putting in the evidence of the of the confidential informant, and, and any other evidence that they might have and the recording. Right, that's what we're talking about. That's the difference here. Right. Your Honor, but that would be a significantly different denaturalization case from the one that the government actually brought here, and the case that the government actually filed in the Eastern District relies on the preclusive effect of the conviction which gives them. That's the easy shortcut, because he admitted it. It's not the preclusive effect of the conviction. It's the fact that he of what he said during the course of the convention. Those admissions become admissions against interest right and they will offer your honor two points that that would be a far steeper hill to climb given the standard that would apply in a denaturalization action they would have to prove that up. And the second point your honor is that even if he were denaturalized in this alternative denaturalization case, then he would not face deportation because there would be no conviction there would be no aggravated felon. I asked you, Mr. Kassim. Your client played guilty to two crimes didn't he. That is correct your honor. The second one was lying to the FBI. That is correct your honor 1001. And that occurred after his naturalization application didn't it. That's absolutely correct your honor. So, are you at a fork in the road here is he entitled to relief on one but not the other. No, your honor. I mean, I don't believe we found a situation or a case where that would be possible he seeks vacatur of the the plea the conviction the sentence, and he's taking his chances of course, but what's the, why would one vacate. Why would his counsel be incompetent as I realized it sounds unusual but it's odd in the sense that his line to the FBI. It can't well it might serve as a basis for a denaturalization but no wouldn't because it was after his naturalization had occurred. So it can't be used to denaturalize him right. That's correct. That's correct. What's the. I don't understand how, and this. I don't want to take it down a side road too long but this has nothing. This is, he's not really entitled any relief on that right. If he had pled guilty simply to that he wouldn't be entitled to no relief would he. Your Honor, it's an interesting question if he had just pled guilty to the false statement charge which as you've pointed out arose from conduct that was entirely post that denied a post naturalization, then there would be no no immigration. The focus is merely on the conspiracy to money laundering. Right, because because that's, that's the the alleged underlying conduct occurred when he was still a non citizen no different from Padilla no different from Jay Lee. I mean, in fact, this case is worse. The problem is, is that, as Judge Walker pointed out, it's not like it's not like the deal because the court was quite clear to say look, the criminal law is or immigration laws and meshed in the criminal law or vice versa, and uses, it just uses certain crimes to then trigger automatic or not automatically but to trigger removal proceedings, and perhaps to limit the Attorney General's discretion with regard to cancellation of removal. But here, it's kind of another step it's not that categorically his having participated in a conspiracy to money launder for terrorist activities is a disqualifying event, it's the fact that he had done it, and this precludes him from contesting it. When someone seeks to denaturalize them right and your honor that that's exactly what what Padilla looks to right whether the criminal conviction is in meshed by operation of law, with the particularly severe immigration consequence and that's exactly what's happening here. This is no this is his conviction. This is a fact of his conviction that he was engaged in doing it. And that, and then there's another fact that he lied about having done it when he applied for his naturalization, I suppose we could take it another step. Should his lawyer also have known that he had children, whose naturalization occurred as a result of his naturalization. I, the problem I have with your. There are a number of aspects of this case that are troubling and difficult to pin down, and you've done both of you done a nice job with your briefing I appreciate it. But for me, this is not just, you're convicted, and then boom, it triggers removal. This is you're convicted and now you can't contest the fact that you may have done something else that triggers the possibility of denaturalization. And the question is, does that then is that of a Sixth Amendment dimension right well well your honor. You know the fact of the conviction can be used in many different ways in both deportation and denaturalization proceedings so let me let me try to unpack this. If the government were to use a conviction to establish conduct that would make someone removable under immigration statutes because of course removal statutes can make people deportable either because of the conviction like the Agfel statute issue in Padilla but there are there's a different class of deportation statutes that rest on conduct. And if the government were to introduce a conviction to establish conduct to render someone deportable under one of those deportation statutes, that would be just as actionable under the Sixth Amendment and Padilla and that's exactly what we have here we have the conviction being used to establish an element that would trigger an immigration consequence a severe immigration consequence like denaturalization, which has been likened to deportation by the Supreme Court, so it's the exact same use and it's merely an application of the principle of Padilla to a different set of facts here. That's what we have. I wanted to know what the principle of Padilla is because Padilla seemed to place a tremendous amount of reliance on the fact that the conviction itself was the trigger, not the conduct leading to the conviction but the conviction itself was the trigger. They did talk about immigration consequences in loose terms, but the actual facts which really you want to look at and which accepted Padilla from the collateral direct consequences paradigm was the direct connection between deportation and the statute. Denaturalization was not considered in that case, and I know of no case that's actually held which you would like us to hold here. Mr. Kassim, please take your time to respond. And I have a question for you after that too. Thank you, Judge Carney. Well, absolutely, Judge Walker. I mean, it's a central question here. And with this conviction, the immigration consequences that we're talking about, so denaturalization and deportation, fit Padilla's mold. Padilla asks a couple of questions. It asks, is the immigration consequence particularly severe? And there's no dispute that denaturalization and deportation are both exceptionally severe immigration consequences. Then it asks, is there this intimate connection with the criminal conviction? Does a criminal conviction flow into the immigration consequence? Your argument then is to try and get this case into the same paradigm as Padilla, and to exclude it from a direct collateral consequences formulation. That's what you have to do here, right? Because as soon as you go back to collateral and direct, then that was not disturbed by Padilla. It was mentioned and it was preserved under that. They took the facts of Padilla and moved it out of that particular form of analysis. That one case. That's correct, Your Honor. The Supreme Court in Padilla held that the direct collateral distinction was ill suited to immigration consequences that were severe and that were enmeshed with the criminal conviction. And both of those things apply here. Let me ask a question if I may. Is it the case, excuse me, that in addition to immigration consequences, the conduct that he pled guilty to also potentially exposed him to criminal consequences under Section 1425 of Title 18? Because that punishes as a criminal matter, procuring contrary to law naturalization of a person. And so not only is it an immigration matter, but it's clearly and undeniably a criminal matter as well that falls potentially within the purview of the Sixth Amendment obligation to provide counsel. Is that correct? That is absolutely correct, Judge Carney. And so trial counsel, in fact, created exposure both on the immigration side with denaturalization and deportation and on the criminal side. He did not create anything. He didn't say anything. He didn't make a false statement about the immigration situation. Judge Walker, you're absolutely right. That is exactly what happened here. It was it was omission. Strickland talks about actions or omissions and that and the distinction between affirmative misadvice and silence does not survive Padilla. And Mr. Farhan is entitled to invoke the rule of Padilla because his conviction became final afterwards. If you read Chaydez, the distinction seems alive still. I think Justice Kagan pointed out the distinction and the importance of the distinction. Your Honor, in Chaydez, respectfully, it was because Ms. Chaydez's conviction became final before Padilla and therefore she could not invoke the benefit of Padilla, including the fact that the distinction between silence and affirmative misadvice did not survive Padilla. I want to ask another question. Counsel's obligation is to act reasonably under the circumstances, professionally reasonably under the circumstances. And those are circumstances which would be known to counsel at the time. Isn't that correct? We can't use hindsight. Okay, we go back to the guilty plea, which was three and a half years before Padilla was decided. The collateral direct distinction was alive and well and was operative in the Second Circuit. The lawyer knows that he's a naturalized citizen, period. He doesn't know the circumstances surrounding that. Your client chose not to share the circumstances with him for what I would think would be fairly obvious reasons at the time of the plea, namely that he had misled the agents. So the lawyer is just left with the circumstances as they exist at the time. And I'm not talking about Padilla as a matter of law. I'm talking about the fact that there is a case. There's a case out there that says that immigration consequences, that the guilty plea, at a guilty plea, you have to warn of the possibility of deportation and similar serious, taking it your way, similar serious immigration consequences. None of that would have been known to Attorney Houston at the time. He's just doing his job and he doesn't inquire further into the denaturalization because it's under the existing law. It's not a matter for him to worry about. Isn't that clear enough? Your Honor, so trial counsel knew that he had a client who at one point in time was a non-citizen. He knew that from the first week of his representation. And he was advising that client to plead guilty to conduct that took place while he was a non-citizen. And that's exactly the universe of defendants that Padilla was meant to protect. Right, Padilla was meant to protect it, but Padilla hadn't been decided at that point. Well, you're talking about the legal landscape that he was faced with. Absolutely, Your Honor. And look, when Padilla was decided, I mean, again, there's a point that Mr. Farhan can invoke Padilla as a matter of law. But to your question, Judge Walker, Padilla itself took note of the fact that prevailing professional norms had shifted such that by 1995 at the latest, it says at least 15 years prior to Padilla, it was clear that defense counsel needed to advise about any risk of particularly severe immigration consequences. And here we have both deportation and denaturalization. And so if Mr. Farhan cannot invoke the protection of the Sixth Amendment here, given the severe risk of deportation that trial counsel exposed him to, then he's just not going to be able to do it. And it would leave naturalized U.S. citizens in a less advantageous position. Those were the terms of the Supreme Court in Costello in 1964, in a less advantageous position than if they had never naturalized at all. And that would just be an absurd rule. No reasonable jurist would adopt that as a rule under the Sixth Amendment, Your Honor. The government also raises the Teague point in its brief. You say it was waived below because it wasn't introduced below. We have discretion to affirm on any basis that exists before us. So one of the things I'm wrestling with is whether this waiver should be overlooked or not. And the reason that I'm wondering whether it should be overlooked is because I'm trying to figure out how you were prejudiced by the failure of the government to raise the Teague issue before the district court in this case. Well, Your Honor, it would be highly unusual for this court, given the fact that the argument wasn't made. But how were you prejudiced on a pure point of law that was not raised in the district court that is being raised on appeal? There's no reliance involved. There's no course of litigation as occurred in the Young case that Judge Parker referred to in dealing with the Stone issue. So, I don't think you just either say we're going to recognize or unrecognize the waiver based upon our personal predisposition. I think we have to look at circumstances that might cause us to rule one way or the other and what the standard might be. Well, Your Honor, we addressed the reason why it would be highly unusual for this court to disregard the fact that they forfeited the argument. But the prejudice to your question, Your Honor, is simply that this was raised for the very first time, not when we were briefing the certificate of appealability before this court, not when we were before the district court. It was raised in the government's brief, and there was a compression of time and space in which to address that argument. We had the sort of a less amount of time. You had the same opportunity to address, to answer the government's position on the merits than you would have whenever it was done before. Well, Your Honor, we did our best, and we also argued that other than forfeiture, there simply is no Teague problem here, Your Honor, because this is merely an application of the principle of Padilla to a different set of facts. I understand that, but we could agree with you on that, or we might not, depending on whether this case would announce a new rule. In other words, it would be a new rule beyond Padilla, or is it just Padilla warmed over? And that's another complicated question. I'm just trying to give you a position of sort of the issues that are troubling to me on this thing. Padilla, the other point is that I have here is that what was what I'm trying to go back I'm going back to the time that that when when when at the time of the original plea and prosecution before that. My understanding from the facts are here of the facts that spelled out in the government's brief about his contact with Shah and the and the informant or the confidential informant. And then he he is faced with his at the same time, he's seeking that naturalization, and he makes the statements that he makes that are the subject of the prosecution here to the to the agents that that that were false. And then, and thereby lies under those circumstances. So, at that point, he was an opera, he had an opportunity. And I'm not saying that everybody has has an obligation, but he had an opportunity to fill in his lawyer at the time of the plea with a full picture about a possible threat to his naturalization or a concern that he, the fact that when he naturalized he he he made misstatements, but he doesn't he doesn't do that. If his lawyer knew that then pretty clear that that that seems to me that that's a different factual scenario than what we have here, under obligation. So Judge Walker, if I may, on this important point, the onus is on the attorney to advise the client once the client has given the attorney sufficient facts and so right here. And so the question is sufficient facts and I don't know that there were sufficient. Well, your honor, there's no way for a lay person to be able to brief their attorney about denaturalization consequences, it's the other way around. So Mr. Farhan made it known that he was a naturalized citizen. Now if at that point, if at that point, trial counsel had just said, look, because the conduct here took place when you were a non citizen, there may be a risk of denaturalization deportation consequences. That's all that Padilla requires when the law is not succinct and straightforward when the immigration consequences are unclear and uncertain. All Padilla requires is for trial counsel to say there may be a risk. And if and if trial counsel had said that would have alerted Mr. Farhan to the consequences and it would have made any subsequent plea voluntary and knowing the fact that trial counsel didn't even say that much deprived Mr. Farhan of the possibility to make the decision that Jay Lee made, which was to go for a Hail Mary or whatever it was I mean in Mr. Farhan's case he actually had viable defenses, but but but even if even if he had no defense, which is what the Supreme Court recognized in Jay Lee in 2017, it would have been rational for a client and his for a defendant in his position to take his chances at trial in order to preserve, not just his ability to remain in the country like Jay Lee but also his citizenship. Yeah, but I'm trying to go back in time to the, to the time when, when they're discussing the plea and trying to figure out exactly how the given the circumstances that existed at that time, how the attorney acted on recently. That's what you want to let me let me lay it out I mean, besides besides the fact that the denaturalization the immigration statute said issue here about aggravated felonies and denaturalization had been on the books. There was ample case law there was Second Circuit case law in Reimer, Rossi, Otto and Asher I mean Asher was under the predecessor statute, but all of these were civil denaturalization cases. Jean Baptiste decided in 2005 out of the 11th Circuit is an analogous case where someone was denaturalized based on the preclusive effect of their conviction. All of these cases had been out and discussed in materials, there had been trainings and 2010 2005, the New York State Defenders Association published a resource that warned about denaturalization risks. This was no secret now may have been less probable than deportation, but that's not the question. That's not the question. I'm not suggesting that it wouldn't have been a good thing for him to do. I'm just wondering whether he had an obligation to do it under the Sixth Amendment. Under those circumstances, and Your Honor, he absolutely had an obligation. That's what Padilla says adverse any risk of adverse immigration consequences, and you owe your client, you have to say something. Of course, he didn't know anything about Padilla because it hadn't been decided yet. But but but Your Honor again you know Mr Farhan can invoke it as a matter of law and Padilla itself said this was clear as of 1995 fully a decade before Mr Farhan's prosecution. We've kept you substantially past your time we're almost 15 minutes. So I think we should turn to the government you've reserved time for rebuttal and I'm sure we'll have a be able to continue our conversation them. Then, Mr. Sean, how do I pronounce your name please. Thank you. Yes, but please, please begin and let's give you 10 minutes in addition, the clerk will please adjust your time to make sure that you have an ample opportunity to address the arguments that have been made, please proceed. Thank you, Your Honor. Good morning and may it please the court. My name is June Sean and I represent the United States on this appeal as I did in the habeas litigation in the district court. The defendant invites the court to find that in 2006, when he pleaded guilty. He had a constitutional right to be advised that his guilty plea could have potential evidentiary value in a future civil proceeding, the naturalization. The court should decline that invitation for the following reasons, they've been if they've been if they've been a lawful permanent resident, he would have had that six a member right with a. If he had been a lawful permanent resident in 2006 before video is decided, and Padilla, having been held in China was non retroactive I don't know that that would have worked out given the timing but certainly given Padilla given Padilla if you've been a non citizen, he would have had a right to be advised at the risk of deportation, Your Honor, seems interesting that one, he's better off if you had been a citizen. So again, Your Honor, I don't believe that's true and let me ask you this, what was, if he was a non citizen at the time, and he was subject to deportation, but the issue was denaturalization and deportation at that time hadn't been decided by video to be a six rule have applied in 2005 2005 is five years before Padilla. Correct, Your Honor, if at that point, the whole world was in 10 circuits 30 states. The issue of DNA of whether whether a consequence was either going to be direct or collateral. And under that, my understanding is that Padilla rescued that that that the non citizen who pleads guilty without being advised to the of the consequences of the deportation consequences from that from that paradigm, but that paradigm was alive and well, in every prior to that, including many, many direct deportation case. That's correct, Your Honor, and if I understand Your Honor's question it's because of a procedural quirk in the case. But let me just ask Padilla applied to acts that were taken substantially before Padilla was decided. Isn't that right to a criminal act that was taken well before and spoke about also the norm has requiring advice on deportation consequences have been prevailing for 15 years. So I mean Padilla looked back itself as to a six amendment constitutional norm for providing advice and I'm looking at Padilla right now to see exactly when the the timeframe was but I think it was at least a decade before. Isn't that right. So there are two parts of the answer, Your Honor. First, if you're on is asking about the kind of prevailing practices point Your Honor is correct that in the Padilla analysis and determining at that point that advice to non citizens of the And the answer there is that had Mr. For him been been a non citizen, and had he pleaded guilty in 2005 pre Padilla, and had that conviction in final pre Padilla, then he could not avail himself with Padilla that's that's that's what shot at me. You're right about that but the way you, your opening was is that he wasn't entitled to it because it was a civil proceeding so I wasn't presuming that it was a final, he had the right is just that he hadn't exercised it, and they lost it after his conviction became final because Padilla is not retroactive. Padilla didn't create something new in the, in that sense it just said that he had a Sixth Amendment right. Well, it created something new in the sense of it being as Judge Walker rightfully noted but it said that we, but they had never, but they said the Supreme Court said in the majority opinion said that they had never accepted the collateral consequences, direct consequences paradigm for analysis, but then they went on ahead so you don't use that here. And then they said, this conviction, criminal convictions are enmeshed in the immigration law. And so therefore has a consequence, but, but what troubles me more is why, why are you so late to the dance. Why wasn't this raised below. It's very easy to understand. Were you that were you the lawyer of record at the district court. I was your honor. Why did you didn't occur to you. It was overlooked your honor and did it occur to you that when there was an application for a certificate of appeal ability here. No, your honor. It didn't. And it shows up in your brief at the last minute. Oh, so now all of a sudden we're supposed to do a teague analysis on this after, after all this is all the time that's been spent on this because you suddenly decide the teague produces a sure win for you. How would we treat this if this were a defendant coming late to the dance. You'd be all over this with waiver, wouldn't you. So, wouldn't you. Your Honor, I don't know what would happen in that hypothetical case I don't understand how you list it. Now, the question I have the question I have is why the young case, how you distinguish the young case that was cited by your adversary from from from your case on this. And there they recognize the waiver under stone, and that the stone the stone prohibition of using the exclusionary rule and collateral on collateral attack was was was not way. So, how do you how do you distinguish your case from that. Your Honor, I'm not sure what we're distinguishing. Well, my understanding when I got the right case, young was a case involving the use of the raising a Fourth Amendment violation on collateral attack. And it was litigated on collateral attack for three or four years without anybody pointing out that stone could step in and say that that was that was improper stone says that you cannot raise a Fourth Amendment violation collaterally. And it's not a jurisdictional point it's a it's a, it's a, it's a, it's a basic rule that is, is, is out there. And that was what happened in that young case that Judge Parker decided, and he said that there under those circumstances there shouldn't be a. He what he was, he was going to recognize the waiver by the government in that regard, because the litigation had gone on for like three or four years. Under those circumstances. And so there was prejudice presumably to the to the to the defendant. I take it that your position here is that there's no prejudice to the defendant, because this is a pure question of law that could be could be decided at any time by our court. That's correct, Your Honor, and I think goes a little further than that, if I might address the issue. Look, the government's position is not that that it didn't forfeit the arguments below and that it shouldn't have made the arguments below we should have. But I think the court retains discretion, nonetheless, to consider the key question, and should for the following reasons. First, the key question is answered by almost exactly the same questions of the underlying merits questions, namely, what is the DM mean is deportation like the naturalization, it is the, the exact same arguments on on a different issue. Second, and I think as importantly, you know, this, this court declined to address the Sixth Amendment issue in Nunez, and should the court, not be inclined to wade into the underlying merits issue of is there a Sixth Amendment right to to go beyond and and and address the naturalization will achieve resolution of the case would be a more modest would be a more modest resolution of the case, which is to say, well, if there were such a rule, it would certainly be a new rule of constitutional law. And so with that, I thought we would still have to address whether it's a new rule or not or whether it's simply an application of Padilla, and to have it not developed over all this time and through the oral argument on the certificate of appeal ability for goodness sake. I mean, it seems like an important question and this is a question that the district court has, you know, opined on that's been very well developed here and as Judge Wesley points out, you know, we decide so many habeas cases on waiver by the defendant and exhaustion procedural bars, it seems not even handed to not apply the same kinds of considerations to the government's failure to raise it here. You know where it's been well developed and we granted certificate of appeal middle and precisely the question that we are addressing, and then you're suggesting we not address. So I'm also troubled by that. Understood, Your Honor. And with that, let me move on to the merits, starting with the Sixth Amendment question. Let me ask you about the collateral direct question in the context of Young's, another not Young v. Conway that Judge Walker was referring to, but Young's about civil commitment. You seem to rely heavily on that as a parallel collateral consequence that there's no Sixth Amendment obligation of counsel to advise on. But Padilla established in no uncertain terms the importance of deportation as enmeshed, to use Judge Wesley's term, aspect of a guilty plea on a criminal case. This case also has criminal consequences, potentially exposing the defendant to prosecution for misstatements in the connection with his naturalization application. And also Section 1451 seems to place an obligation on the government, says it shall be the duty of the United States attorneys upon affidavit for good cause shown to proceed to cancel, to seek to proceed to cancel certificate of naturalization that was illegally procured or procured by concealment of a material fact and so on. So both the statute and the context of Padilla suggesting that these are so tightly enmeshed seems to be quite different from Young's, which looked at civil commitment as a potential collateral consequence in which there is enormous discretion in the government, a new burden of proof, different facts to be shown, that is not nearly so automatic as denaturalization and thence deportation in this context. What can you tell me that draws them closer together and makes your reliance on Young's more reasonable? So, Your Honor, to take that in a couple of pieces. First, it is not the case that denaturalization is enmeshed with the criminal conviction in the same way that deportation is. In the deportation context, and that's what Padilla was about, the conviction… Deportation does follow very closely through denaturalization though, isn't that correct? No, Your Honor. They are separate immigration proceedings and the only proceeding pending as to Mr. Farhane is a civil denaturalization proceeding. I understand that, but deportation, we have this prosecution and we have denaturalization and we have deportation. And I'm just suggesting that deportation would, in this circumstance, follow very closely from denaturalization. And so you have that one gap closed and the denaturalization follows very closely because of the collateral estoppel effects from the criminal prosecution. So I'm suggesting that they're very close in a way that in Young's the civil commitment process is not. So, Your Honor, if I could respond to that. I think in this case, in the kind of two-step process that Judges Wesley and Walker referred to before, where all the work in this case is happening is the initial first step to get to denaturalization. And that's what the government is saying is unlike deportation. In deportation, which is discussed in Padilla, and the court is very explicit about this, what makes deportation unique, what allowed it to be a special exception to the direct collateral consequence paradigm that this circuit and every circuit had recognized at that point, and the circuit continues to recognize the government would submit, is that deportation cares about the conviction itself. The conviction is the legal predicate. It is both sufficient and necessary for deportation to occur. That is simply not true of denaturalization. What's happening here is not you were convicted, therefore you're being denaturalized. What is happening is you obtained your denaturalization fraudulently. You had an obligation to tell the truth during your naturalization process about what you were or weren't doing. And as part of the government's proffer of evidence in that civil proceeding, under civil causes of action, at which the government bears a clear and convincing burden, what the government is offering as a piece of evidence is, well, you're collaterally estopped from arguing that you didn't do the thing that you did. If you weren't collaterally estopped, well, leaving that aside, let's assume that in this situation, when you're dealing with denaturalization, it seems to me that you are looking at the underlying facts and you're trying to see whether they're collaterally estopped. But if collateral estoppel is not used, that doesn't foreclose denaturalization, right? That's completely correct, Your Honor. In other words, in the deportation consequence, the conviction is the but-for sine qua non for deportation. It's not true in denaturalization. That's exactly right. In denaturalization, you're denaturalized because of what you did when you lied to the agents. And how they arrive at that is an evidentiary matter that is either done through collateral estoppel, and you can't go back on what you said at the plea, or it's done by putting the confidential informant and Shaw, if he's available, and using the recordings and using all that information to establish that he lied to the agents before he got his naturalization. So there's no but-for connection in the same way that there is for deportation. That's exactly right, Your Honor. And not only is that important for, for example, the Sixth Amendment point to talk about why we're not outside of the direct collateral paradigm here, it's also important for the prejudice point. There's a reference made by my adversary and then lead to this Hail Mary idea. In a deportation context, even if the evidence looks stacked against you, you might as well lob a Hail Mary because if you get it acquitted at trial, the acquittal means that there's no conviction. No conviction means that they cannot deport you because deportation under that context requires the actual judgment itself. The Hail Mary analogy doesn't apply here. The Hail Mary analogy doesn't apply because in a world in which even Mr. Farhane was acquitted at trial, he faces the same denaturalization exposure. That exposure is not a consequence of this conviction. Why does that make it any less important for counsel to advise a defendant in Mr. Farhane's position that he may suffer adverse immigration consequences and or citizenship consequences? I still, I don't understand why that, I mean, that's an interesting point, but it still seems to me that the Padilla concerns about the close ties between citizenship consequences, potential deportation and the guilty plea need to be recognized by counsel as part of the adequate representation. Help me understand, what am I missing? So a couple of responses on that, Your Honor. First, Padilla was not looking at immigration consequences writ large. The court was actually very, very careful each time it articulated its holding and its reasoning to talk specifically about deportation of non-citizens. And that was because for that class of individuals, non-citizens, convicted of aggravated felonies, and I think in Padilla itself it was controlled substances offenses. It's automatic or near automatic. Why is it, why is deportation for non-citizen any less traumatic than denaturalization and then deportation for a citizen? Seems to me much more serious consequence for a naturalized citizen. So the word I used was automatic, Your Honor, not traumatic. And I don't respect, I don't think the analysis in Padilla or otherwise turns on the subjective importance that the defendant places on the collateral consequence. And there are myriad examples of this. For example, one might imagine that someone's guilty plea or guilty plea allocution could be used in some evidentiary way, collateral estoppel or simply as a piece of evidence or otherwise, and say a child custody proceeding. And where given the nature of the actual sentencing exposure, the person might care a whole lot more about the fact that that allocution bears on child custody, bears on professional licenses, bears on assets, or any number of... That's true, but this plea also creates potential criminal liability. Respectfully, Your Honor, I don't believe that's correct. The plea created no criminal liability. The criminal liability existed, if it existed at all, when Mr. Farhane engaged in the conduct of... Excuse me, but still, yes, the underlying conduct was the primary predicate, but still to plead guilty to this conduct that was charged also seems to me potentially subjected him to liability for procuring his... Isn't that correct? So, to answer that, I mean, first, the evidence that the government would need to prove that hypothetical criminal denaturalization case, which, by the way, is a different statute... That's not the basis of his application, though, is it? His application is premised upon the denaturalization, not that his attorney was deficient for failing to warn him of the criminal applications of his plea, correct? Correct, Your Honor. Can I ask you... I want to try and iron out in my mind, because you said something I was giving you a hard time, and I want to make sure I understand this. Presume Teague is in play, then we still have to decide if this fits within Padilla, right? That's correct, Your Honor. I presume that Teague is not in play. It either fits within Padilla or constitutes a new rule of understanding of the Sixth Amendment, not previously articulated by the Supreme Court, correct? So, if Teague is not in play, if the court is reaching the underlying merits, then the issue is presented, whether it's decided by... for this particular circumstance, if we were to say this circumstance is not Padilla. Correct, Your Honor, although the government's position is obviously that it's not the logical progression. Oh, I understand. No, I'm not characterizing what you've been arguing. It's important to keep in one's head what the decision tree is after one says Teague or no Teague. Okay. Thank you. So what is the status, in your view, of the collateral direct distinction as it exists now with regard to cases that do not deal with deportation directly from a criminal conviction? The government's view is that it remains the law of the circuit. It was the law of this circuit and every circuit before Padilla. Padilla, quite explicitly in Padilla itself and in Shida, said that that was not disturbed. And this court in Young's, albeit in the Fifth Amendment due process context, applied it in that context. The government's not aware of any law suggesting that that distinction has been abrogated. Yeah. Okay. Thank you. Okay. Right. Thank you. You want to take a moment to wrap up or are you feeling like you've said what you need to say? If I could just have a few seconds, Your Honor. Please do. The defendant pleaded guilty with the benefit of a plea agreement that reduces sentencing exposure by 10 years. He had no constitutional right to receive advice about the evidentiary use of his plea in the civil proceedings. His lawyer had no obligation to give that advice. And in any event, we cannot show that he would have done anything different had he received that advice. He received constitutionally competent counsel and the court should affirm. Thank you. Thank you. Thank you very much. Mr. Kassim, you have three minutes of rebuttal. Thank you, Your Honor. Just a handful of points. The use of the conviction here, I think, is particularly central. What the government is doing is that it is using the conviction to establish an element of deportability. Now, under the aggravated felony statute, that's because the conviction itself is an element of deportability. But there is a range of other deportability statutes where conduct that are based on conduct and not a conviction. And if the government were to use the conviction to establish conduct as an element of deportability, that would be no less actionable under the Sixth Amendment. And in New York, as recently as this year, the Third Department has a case, People v. Saunders, that recognizes that. There are a number of cases outside of New York state where when the government tries to use a conviction to establish an element of deportability, that is not the conviction itself, but that is conduct that's deemed actionable under the Sixth Amendment. And that's exactly what they're trying to do under this immigration statute, under the denaturalization statute. They're using the conviction to meet an element of the immigration statute to trigger that severe consequence. And I know you've got the Third Amendment or the Third Department case. Can you give us just one or two examples of the types of facts that you're talking about? Sure. Sure, Your Honor. It could be it could be, for example, I mean, a violation, conduct amounting to a violation of an order of protection. Now, that's not a conviction. But but but that those are cases like People v. Amr, People v. Saunders. And that's actionable under the Sixth Amendment, even though the conviction itself is not an element the way it is in the aggravated felony statute or in the denaturalization statute. To the to the distinction between denaturalization and deportation, which Judge Walker has come back to several times. The Second Circuit, it seems, has already crossed that bridge when you it's taken a broader understanding of actionable immigration consequences. When you look closely at a case like Kovacs. Now, the conviction there became final long before Padilla. So he could not invoke Padilla. He was reaching for a couteau. But the immigration consequence there was inadmissibility. It was a risk of inadmissibility. It wasn't even deportation, though. More recently, 2019 conviction was also final before Padilla, so he could not invoke Padilla. But there the court recognized not just deportation risk, but also the risk of a naturalization bar. Rodriguez itself, Judge Walker, was on that panel for that summary order. That conviction became final after Padilla, just like Mr. Farhan's. And so Rodriguez, Cleopatra Rodriguez, invoked Padilla and the court there cited to Padilla. And so the Second Circuit has already moved past the narrow understanding of deportation only. It's already crossed that bridge. And just just to be clear, Rodriguez was a case of a misstatement by the attorney. Affirmative statement. Your Honor, Kovacs, Doe and Rodriguez. Right. But but that distinction does not survive Padilla. Padilla makes it clear. Chavez makes it clear. Padilla says it would make no sense. We don't want to limit our holding to affirmative misadvice because that would lead to absurd results, just like the one we have here, where we would be incentivizing silence about important consequences. You know, you don't draw a distinction between an attorney purporting to have knowledge of the immigration law and saying there's no problem and not and not saying anything under circumstances that that do not do not raise no red flags. Your Honor, you know, in a pre-Padilla world, affirmative misadvice under Couto and other cases would have been actionable. Right. But post Padilla and Mr. Farhan's conviction became final after Padilla, he can invoke that decision. The distinction makes no difference. Padilla eliminates that distinction and forfeiture. Your Honor, I mean, you've pointed out, Judge Carney and Judge Wesley, that, you know, these grounds were simply not offered below. This would be a huge departure from the way that the court treats all litigants and particularly defendants, as you've pointed out, as as a defense lawyer. I know that if I if I didn't raise an argument the way the government has not raised an argument, I probably would not be spared. And rightly so. But more importantly, there is no problem here. Right. The Padilla rule, the logic of Padilla applies to all non-citizen defendants who are being advised to plead guilty to conduct that took place while they were non-citizens. It doesn't make sense to carve out an exception for non-citizens who plead guilty to conduct arising from when they were non-citizens to carve out an exception. If they happen to naturalize down the line, that would be an absurd rule. No reasonable jurist would hold that rule. And that's why there is no Teague problem here. The last thing I'll say, Your Honor, is the U.S. government has not disputed that both denaturalization and deportation are the goal here, that they would be automatic. It's going to use the conviction to trigger both of those immigration consequences as virtually inevitably as they would have taken place. What about what about the fact that I think it's 1227 of Title eight talks about is deportable once a person has been convicted of certain things? There's nothing like that is denaturalized, is subject to denaturalization as a direct consequence of a conviction. But Your Honor, there are other immigration statutes that lay out conduct, including violation of a protective order that don't reference a conviction. And if the government comes in and uses an unadvised conviction to establish that element, then that's a Sixth Amendment problem. And those convictions have been vacated. And so should this one. This is Mr. Farhan's and I'll end on this point. This is Mr. Farhan's one and only chance to invoke his Sixth Amendment right here to guard against not just denaturalization, but deportation. If this court were to affirm, then he would not be able to bring another 2255. He would not be able to bring a quorum novus petition that would be barred under the Sanders v. U.S. doctrine. He would not be able to challenge, you know, to bring up his ineffective assistance claim within removal proceedings. That would also be barred under Hamilton. This is his one and only chance to invoke the protection of the Sixth Amendment. And if this court were to affirm that we're left in a situation where naturalized U.S. citizen, again, to quote Costello from 1964, would be in a less advantageous position than if he had never naturalized at all. And that simply cannot be the lawyer. Thank you very much. Thank you both. Very well argued. We'll take the matter under advisement. Thank you.